IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 31, 2012 Session

# CITY OF CHATTANOOGA, TENNESSEE, ET AL. v. HARGREAVES ASSOCIATES, INC., ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 09C403      Jacqueline S. Bolton, Judge**

---

**No. E2011-01197-COA-R3-CV-FILED-JUNE 21, 2012**

---

The plaintiffs in this matter, the city and a redevelopment group, filed this action against the defendant entities involved in the design and construction of a large municipal project on the city's waterfront. Also named as a defendant was the development manager for the project. The trial court granted summary judgment to the defendants on the basis that the plaintiffs' lawsuit was barred by the applicable statute of limitations found in Tennessee Code Annotated section 28-3-105. The plaintiffs appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., joined and HERSCHEL P. FRANKS, P.J., dissented, filing a dissenting opinion.

Michael A. McMahan, Valerie L. Malueg,, Sam D. Elliott, Wade K. Cannon, and David G. McDowell, Chattanooga, Tennessee, for the appellants, City of Chattanooga, Tennessee, and Chattanooga Downtown Redevelopment Corporation.

Marc H. Harwell and Benjamin T. Reese, Chattanooga, Tennessee, for the appellees, Hargreaves Associates, Inc., Continental Construction Co., The River City Co., NABCO Electric Co., Inc., Masonry Specialist Corp., Valley Crest Landscape Development, Inc., Hobbs Architectural Fountains, and Moffatt & Nichol, Inc.[1]

---

[1]Pfists Enterprises, Inc. did not move for summary judgment and is not a party to this appeal.

**OPINION**

**I. BACKGROUND**

This lawsuit arises out of the Chattanooga 21st Century Waterfront Plan ("the Project"), a construction project along the Tennessee River in the downtown area. The Project was constructed in "Packages." "Package 2" included the construction of "The Passage."[2] This litigation specifically concerns alleged errors and omissions in the design and construction of Package 2.

The City of Chattanooga ("the City") and Chattanooga Downtown Redevelopment Corporation ("CDRC"), a Tennessee non-profit corporation and instrumentality of the City (collectively "Chattanooga"), entered into a contract for the provision of architectural services for the Project with Hargreaves Associates, Inc. ("Hargreaves"), a consulting firm comprised of landscape architects and planners, on December 2, 2002. CDRC was to administer the Project on behalf of the City and was designated the "owner" of several parcels of land in the Project area. Hargreaves was involved in the design and development of the master plan for the approximately 129 acres of the Project. Hargreaves also was responsible for reviewing completed surveys and reports, for notifying the development manager of any noted discrepancies, and for providing "advice on the scope of work for remaining field work."

On July 1, 2003, CDRC entered into a Development Management Agreement ("the Agreement") with the River City Company ("RiverCity"), a Tennessee non-profit corporation created in 1986 to implement the Tennessee River Park Master Plan.[3] RiverCity's board of directors is made up of the Mayors of the City and Hamilton County, the Chairs of the City Council and the Hamilton County Commission, and other community leaders. In the Agreement, CDRC, listed as the "owner" in the contract documents, retained RiverCity as the development manager to "organize, coordinate and provide advice with respect to design, construction and development of the Project."

According to Hargreaves, RiverCity was required by contract to notify CDRC of all

---

[2]A reflecting pool and stairway located between the Aquarium and Market Street forms a passage from First Street down to the Riverfront area at Ross's Landing.

[3]RiverCity notes that its chartered purpose is to assist the City and Hamilton County with economic development initiatives for downtown Chattanooga.

relevant issues associated with the Project.[4]  All contractors, including Hargreaves, were to use RiverCity – CDRC's Designated Representative – as a conduit to relay information to Chattanooga concerning the Project.

On or around November 4, 2003, the drawings for the Package 2 construction, which included The Passage, were completed and approved by Hargreaves.  Construction began shortly thereafter.  Continental Construction Company, Inc. ("Continental") acted as the primary construction contractor.  The other defendants/third-party defendants, Moffatt & Nichol, Inc. ("M&N"), Masonry Specialist Corporation ("MSC"), NABCO Electric Co. ("NABCO"), and Valley Crest Landscape Development, Inc. ("Valley Crest"), performed various design or construction-related activities on the Project.

Throughout 2004 and 2005, Hargreaves claims that on many occasions, it informed RiverCity of various construction problems and issues.  Hargreaves notified RiverCity of construction problems via reports it would periodically issue to individuals working on the Project.  According to Hargreaves, specific problems of which RiverCity was made aware by Hargreaves include the following:

(i)     On October 28, 2004, Hargreaves created field report No. 156 regarding observations made on October 27, 2004.  Joonyon Kim and Gavin McMillan of Hargreaves, Mike Winters of Moffatt & Nichol and Jeff Shelden of Moffatt & Nichol were on-site and observed that wall #1 "is moving."  They also "noticed the esplanade is settling on both sides of new parkway bridge and caused hairline cracks on wall #1 facing the river."  The information or action that was required was for "Arcadis to visit the site and assess the damage on the wall #1 and provide repair strategy."

(ii)    On January 7, 2005, Hargreaves issued a memo regarding action items needed, and reference is made to the Passage wall #1 settling.  With respect to the north wall, reference is made to the control joints being in the wrong places.  According to Arcadis the cracks in the north wall "should not be of concern, but further observation is required.  Epoxy to be injected in cracks."

_____

[4]In its answer to Chattanooga's complaint, RiverCity noted that for most of the construction period, former City Mayor – and current United States Senator – Bob Corker was CDRC's designated contact on all construction coordination.  RiverCity related that it also worked closely with City's Chief Financial Officer and the Department of Public Works.

The punch list also noted that the esplanade was settling on both sides of the new bridge and such was the responsibility of both Arcadis and Stein. The settlement was approximately 3/4". Hargreaves also noted that the pavers needed to be fixed with Package 2. Hargreaves recommended that Dan Kral, the Project representative for River City, get something in writing regarding such a fix.

(iii)   On January 14 and January 28, 2005, Hargreaves issued a weekly update once again expressing concern about the same problems as afore-referenced.

(iv)   In daily field report #322 dated January 25, 2005, Hargreaves issued a memo to Kenny Statham of Continental regarding a concern about water being trapped inside the Passage panels should flood water or even run-off water from the ceiling panels migrate behind the dripping wall cladding. In response, Dan Kral explained that the water would likely migrate "to the corners where there is a slot approximately 1/8" square [which would] allow the water to drain through the stiffener and then down the sheet to the end (of each 8' sheet) to drain out of the 1/4" gap." On January 26, 2005, Hargreaves responded to Dan Kral's assessment of the water infiltration behind the panels of the Passage concern. Hargreaves specifically wanted to know whether sediment from a flood would keep the panels from free-draining.

(v)   According to "new RFI No. 62" dated February 1, 2005, concerning the Passage cladding, Dan Kral was sent a memo by Kenny Statham of Continental stating that the existing concrete wall on the east side of the Passage is out of plumb by approximately 3" and out of alignment in the north/south direction by approximately 6". He was advised that the masonry cladding will need to be adjusted in order to cover this wall. The proposed solution was to make the "top cap 22" wide instead of 18" wide in order to cover the wall irregularities," and he stated that there might be a time change associated with the proposed fix and perhaps a cost change.

(vi)   On February 25, 2005, Hargreaves issued a weekly update once

again outlining the problems with Package 1 and noting in red type that the Passage wall #1 was moving. The esplanade was settling on both sides of the new bridge – dropped 1/4". Pavers needed to be fixed. Hargreaves also noted in red a concern about utility enclosure #1 BFP leak with responsibility attributed to Continental or River City; concern about Passage 150 HP pump butterfly valve (submittal #115) with responsibility attributed to River City or Dan Euser; a concern about Passage wall #2 irregularities with responsibility being attributed to River City; a concern about a field test response with responsibility to Valley Crest or Continental; a need to coordinate utility vaults with responsibility being attributed to River City; and a concern about Passage wall drainage outlet to the river with responsibility being attributed to River City.

(vii) On March 1, 2005, Hargreaves prepared a memo regarding the problems concerning the construction of Passage wall #1. Hargreaves described the problem as follows:

> We specified to fill behind the passage cladding with latex modified mortar. The idea was to build it like a stone wall – solid with no air gap so we are good for flooding and debris impact and mounting Cherokee art, etc. The subcontractor has built it so far like a building veneer with air gap that will withstand wind loads but not much else. They have suggested filling gap with Styrofoam sheeting and have weep-holes but given the extreme variation in the gap because of the poor concrete wall tolerances a neat fit is not possible.
>
> Other options include injecting urea-formaldehyde foam into gap, loose fill with vermiculite, mortar with perlite for lightweight, etc.
>
> Why can't we just fill it with mortar every 4 or so courses? How do you determine if the load from the mortar is enough to push the cladding out

-5-

before it dries?

(viii)    Following this specific warning from Hargreaves, a number of memos were exchanged between Moffatt and Nichol, Continental, Hargreaves, and River City concerning a possible solution to the problem. River City was told and observed that the walls had not been properly constructed and was enlisting the input of Hargreaves and others in an effort to avoid demolition of the walls and reconstruction.

(ix)    On March 11, 2005, Hargreaves issued a weekly update stating that Passage wall #2 was moving and attributed responsibility to Arcadis. Hargreaves also noted settlement along both sides of the new bridge – dropped 3/4". Finally, Hargreaves expressed continued concern about pavers that needed to be fixed with regard to Package #2.

(x)    On March 18, 2005, Hargreaves sent a weekly update stating in pertinent part the following concerns: settling of the esplanade on both sides of the new bridge; a need for pavers to be fixed; SS river jet shrouds; Passage wall filling material below the 100-year flood level; wall #1 west side cladding – continuous surface . . . .

(xi)    On April 1, 2005, Hargreaves issued a weekly update reiterating the aforesaid problems. Hargreaves again noted that The Passage wall filling material was below the 100-year flood level and was a "red level concern."

(xii)    On April 7, 2005, Dan Kral of River City issued a memo to Hargreaves with copy to Continental that an agreement had been reached as to the cladding fill between the cladding and the wall. Masonry Specialists had proposed a fix with an estimated cost of $36,000 which Dan Kral estimated to more likely cost $15,000-20,000. Dan Kral stated that he had authorized Continental to release the work to be done by Masonry Specialists.

(xiii)    Hargreaves' weekly update of April 8, 2005 reiterated the concerns as stated in prior weekly updates; listed a concern

about the Passage vault room vent power connection which was attributed to Moffatt & Nichol; noted that LAM and DEW were to conduct a site visit on May 9 and 10; and reported that the river jet flow straightener remained a problem as did the Passage 150 HP pump butterfly valve and the SS river jet shrouds.

(xiv)    On April 29, 2005, Hargreaves sent field notes to Dan Kral following Hargreaves' site visit which had occurred on April 28, and those site notes provide in pertinent part the following:

> Confirm what is in Valley Crest's mortar mix (I did not see latex and it is typically a wet mix, not dry). If this dry mix does not get wet to stabilize cement and then dry to set, then there is going to be a big efflorescence problem.
>
> More riprap at River Walk West.
>
> How are the shrouds going to be cut & adjusted & affixed.
>
> Expansion joints in wall cladding are missing.
>
> Live stakes in riprap are too shallow and are all dead -- replace.
>
> How are Passage uplights in runnel fixed in?
>
> Passage paver edge is not ground and looks crap.
>
> Wall East has moved again 1/4" since last marked.

(xv)    On May 3, 2005, Hargreaves sent a memo to Jay Floyd of Arcadis with a copy to Dan Kral which stated in pertinent part as follows with respect to wall #2:

> Since Dennis Gowins' last assessment that the wall had finished its movement out, it has indeed moved out about 1/4" at the top intersection with

the bridge where it was previously marked. This I have seen.

The word from site is that wall #3 is still settling and has cracked some cladding over it. This I have not seen.

As the cladding is continuing going on for the opening, this is Arcadis' last chance to do whatever you need to do before it gets real expensive to do any further investigation or remedial action.

(xvi)  On June 10, 2005,[5] Hargreaves issued a weekly update reporting in red ink that the wall #2 was moving again and assigned responsibility to Arcadis and Stein; and Hargreaves once again reported the settling of both sides of the new bridge and the need to unblock wall #2 sub-drain. Hargreaves also stated that The Passage 150 HP pump butterfly valve had still not been addressed; nor had the SS river jet shrouds installation been conducted; nor had the jet manifold downsize been addressed; G1 fixtures near the Passage were damaged; Passage wet mortar mix was a problem; additional riprap on the corner of the non-grade river walk needed to be installed; expansion joint on Passage cladding was a problem; dead live stakes needed to be replaced; Passage uplights (G6) fixing details were noted; a Passage paver finish on the exposed side was noted; a Passage river jet wind sensor was noted.

(xvii)  On June 24, 2005, Hargreaves issued a Package 2 punch list which recommended in pertinent part among other things as follows: "Fix the water level control; clean & rub algae on wall, steps & terraces; repair undermined joints at steps adjacent to runnel; check the wet mortar mix; fix G6 light fixtures; remove water stain on wall #1 north face and caulk top of the wall; attend to the SS flashing on the parkway bridge ceilings; clean the utility vault; complete cladding installation on wall #2; fix the water sanitizing system; repair damaged cladding on wall

---

[5]The substantial completion date for Package 2 was June 1, 2005.

#2; SS river jet shrouds installation; install EJ on the wall #2 cladding; paver finish on the exposed side; repair hairline "crack on terrace sloped walkway; replace dead/live stakes along the riprap bank; . . . ."

(xviii) Dan Kral contacted Hargreaves on Friday, July 29, 2005 with a "call for help" because things were falling apart at the Passage fountain. In response, Hargreaves contacted Dan Euser – the designer of the water feature – because the Passage fountain was supposedly falling apart to the point of being inoperable. In response, Dan Euser scheduled a meeting in Chattanooga for August 18, 2005.

(xix) On September 6, 2005, Hargreaves contacted Jeff Shelden of Moffatt & Nichol regarding a solution to the west end bump out differential settlement, and Jeff Shelden recommended "remov[ing] the existing slab and inspect[ing] the area adjacent to the river walk. They should make sure that the filter fabric and riprap is properly installed to ensure that material is not being lost at this location. This may require some excavation of the sub-grade material. . . . Next, the area should be vibrocompacted and then the slab can be re-installed." On the same day, Hargreaves sent the recommendations to Dan Kral.

Contrary to the position of Hargreaves, it is contended by Chattanooga that issues with the Project were first brought to the attention of the Administrator of the Public Works Department for the City around July 19, 2007. According to Chattanooga, prior to a report involving electrical matters with The Passage, the City and CDRC were unaware of any material construction or design defects with the Project. After the identification of potential problems in July 2007, Chattanooga hired TWH Architects, Inc. ("TWH") to evaluate the Project and prepare a report regarding the problems. TWH issued its report nearly a year later on June 27, 2008. Hargreaves observes that the TWH report stressed four main areas of concern: passage wall defects, defective installation of concrete pavers, electrical defects and defects in the design and/or construction of the amphitheater and sidewalks resulting in settling of the amphitheater and the sidewalks – items Hargreaves had previously identified and raised with RiverCity.

RiverCity relates that it kept Chattanooga and its representatives completely informed and updated regarding the status of construction matters and substantive changes throughout the Project. According to RiverCity, Chattanooga gave direct or indirect approval regarding

all issues raised pertaining to the Project. In fact, RiverCity asserts that "in some instances the changes at issue were made at the direction of City employees." RiverCity maintains that Chattanooga never voiced a claim or concern that the organizational and/or reporting obligations were not being fulfilled by RiverCity.

After receipt of the TWH report, Chattanooga sent letters to the necessary entities in an attempt to initiate mediation. When no response was forthcoming to the request for mediation, Chattanooga filed suit on March 19, 2009, against Hargreaves, Continental, and RiverCity, alleging several theories of recovery arising out of the design and construction of portions of the Project.

Hargreaves, in its answer, raised the affirmative defense that the statute of limitations barred the lawsuit. In November 2010, Hargreaves filed a motion for summary judgment contending that the cause of action filed by Chattanooga was barred by the applicable statute of limitations that provides actions such as this one must be filed within three years from the occurrence of the cause of action. *See* Tenn. Code Ann. § 28-3-105 (2000). Hargreaves asserted that Chattanooga had knowledge of the Project's problems more than three years prior to the March 2009 filing of the action. MSC, one of the subcontractors on the Project, filed a separate motion for summary judgment that incorporated Hargreaves' motion and added supplemental legal authorities and relied on additional documents produced by Chattanooga during the course of discovery. All other original defendants and third-party defendants (except for Pfists Enterprises, Inc.) joined in Hargreaves' original motion. Accordingly, the arguments raised by Hargreaves represent all the defendants participating in this appeal.

A hearing on the motions for summary judgment was held on March 7, 2011. As Hargreaves argued to the court that RiverCity served as CDRC's agent with regard to communications concerning the Project, the trial court reviewed the Agreement between CDRC, owner, and RiverCity, the development manager, that notes as follows at paragraph 3.3:

> [CDRC] shall cause all instructions from [CDRC] to the Project Architect, the Contractor or other Project consultants or parties providing labor, equipment, materials or services in connection with the Project to be coordinated through [RiverCity] to the end of providing consistent instructions and communications. It is essential to the construction process that [RiverCity] be the principal point of contact and conduit of all information and instructions between [CDRC] and such contractors and consultants. Accordingly, [CDRC] agrees that [RiverCity] shall be [CDRC]'s representative for such purpose and shall be so designated in the contract with contractors, the Project Architect

and any other consultants. Where communication through [RiverCity] is not feasible, [CDRC] will promptly provide [RiverCity] with a written copy of any written notice given by [CDRC] directly to the parties involved in the Project or a written summary of any oral communication so given, as applicable. ***[CDRC] shall designate [RiverCity] as the party to receive communications and documents from the other parties involved in the Project.*** [RiverCity] agrees to communicate with [CDRC] with respect to any development which will adversely and materially impact either the Project Schedule or the Project Cost Budget.

(Emphasis added.). Based on the Agreement, all the defendants asserted that all information imparted to RiverCity, the designated representative, should be imputed to CDRC.

Counsel for RiverCity noted at the hearing:

We were the owners' representative. We weren't engineers, architects or experts.[6] ***The City of Chattanooga was kept regularly informed regarding this particular process*** and, in essence, in some respects we're kind of puzzled and continue to be as to why they sued us for what we did on their behalf, but ***we agree that summary judgment should be granted on behalf of all the defendants.***

(Emphasis added.). In response to the trial court's questioning as to whether RiverCity served as an agent,[7] counsel further replied:

[A]ll the contractual documents or otherwise, we're the owner's representative on their behalf pertaining to the contract. It's specifically in there, so I'm somewhat puzzled as to some of those arguments on that.

---

[6]RiverCity noted in its answer that it "was not hired to build or design this [P]roject; CDRC entered into direct contracts with" the other defendants for those purposes. RiverCity stated that CDRC "maintained full authority over [the other defendants] for design and construction for the [P]roject."

[7]"Agency in its broadest sense includes every relation in which one person acts for or represents another." *Kerney v. Aetna Cas. & Surety Co.*, 648 S.W.2d 247, 252 (Tenn. Ct. App. 1982) (quoting *Howard v. Haven*, 281 S.W.2d 480, 485 (Tenn. 1955)). "Whether an agency has been created is to be determined by the relations of the parties as they in fact exist under their agreements or acts. If relations exist which will constitute agency, it will be an agency, whether the parties understood it to be or not." *Id.* at 252-53 (quoting *Smith v. Tennessee Coach Co.*, 194 S.W.2d 867, 869 (Tenn. 1946)).

The trial court granted the motions for summary judgment of all original defendants and third-party defendants on March 8, 2011. The court found that the relationship of the City and CDRC with RiverCity was defined by the Agreement. The court's memorandum opinion and order provided as follows:

> This case arises out of a dispute regarding a construction project on the Chattanooga river front. The Plaintiff entered into an agreement with River City Company for the management and coordination of design, construction and development of the project. Based upon this agreement, River City was to act as the contact point and agent of the City. As the project proceeded, problems arose. These problems were repeatedly documented and noted to the parties involved. The problems were so apparent that even an individual who is not a construction expert, Lee Norris, took notice of several defects and relayed these problems via email on May 2, 2005, to the appropriate parties.
>
> Despite the problems, the Certificate of Substantial Completion was issued on June 1, 2005. After the Substantial Completion date, similar problems continued as evidenced by an email sent slightly over a month later, on July 29, 2005. An email was sent from an employee of River City, and in the words of the employee, the email was a "call for help" because things were "falling apart." This lawsuit was not commenced until March 1[9], 2009. The parties agree that the applicable statute of limitations for construction defects is three (3) years.
>
> It is this Court's opinion, based upon the pleadings and the attached support, the Plaintiff had notice at least by July 29, 2005, of a cognizable claim against another party. The Plaintiff failed to timely file within the appropriate statutory time period, and accordingly this Court lacks jurisdiction to hear this case. The Defendants' Motions for Summary Judgment are **GRANTED**.

The trial court made the memorandum opinion and order the final judgment of the court pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure on April 25, 2011. This appeal followed.

## II. ISSUES

The issues raised by Chattanooga are as follows:

1. Whether the trial court erred in granting summary judgment against

-12-

Chattanooga as to all claims as a result of finding that the applicable statute of limitations for each of the claims began running at least by July 29, 2005.

2. Whether the trial court erred in granting summary judgment against Chattanooga as to the claims instead of granting additional time pursuant to Rule 56.07 of the Tennessee Rules of Civil Procedure[8] to complete written discovery and take depositions.

## III. STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there are no genuine issues as to any material facts and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.03. In *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008)[9] and *Martin v. Norfolk Southern Ry. Co.*, 271 S.W.3d 76 (Tenn. 2008), the Court held that to be successful on a motion for summary judgment, a moving party must

_____

[8]"Tenn. R. Civ. P. 56.07 is intended to serve as an additional safeguard against an improvident or premature grant of summary judgment. While it insures that a diligent party is given a reasonable opportunity to prepare its case, it is not invoked to aid parties who have been lazy or dilatory." *Kenyon v. Handal*, 122 S.W.3d 743, 753 n. 7 (Tenn. Ct. App. 2003).

[9]The recent legislation regarding *Hannan* does not affect this case because this matter was filed in 2009. *See Burress v. City of Franklin*, 809 F.Supp.2d 795, 817 n. 7 (M.D. Tenn. 2011) ("[T]he Tennessee General Assembly has legislatively overruled . . . *Hannan,* but the new statute[ ] only appl[ies] to cases filed on or after . . . July 1, 2011 . . . . Tenn. SB 1114/HB 158 (to be codified at Tenn.Code Ann. § 20–16–101), setting forth new summary judgment standard)." Tennessee Code Annotated section 20-16-101 specifically provides as follows:

**20-16-101. Burden of proof in summary judgment motions.**

In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:

(1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or

(2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Acts 2011, ch. 498, § 3. July 1, 2011.

either (1) affirmatively negate an essential element of the non-moving party's claim, or (2) show that the non-moving party cannot prove an essential element of the claim at trial. Once the moving party has satisfied this burden, the non-moving party must then demonstrate with evidence beyond the pleadings that issues of fact exist that must go to trial. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993).

Summary judgment is inappropriate when the facts lead to more than one reasonable conclusion. *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 91 (Tenn. 1999). Summary judgment must be overruled "if there is doubt as to whether or not . . . [a] genuine issue remains for trial." *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 347 (Tenn. Ct. App. 1999).

## IV.  DISCUSSION

Hargreaves asserts it was required to report any problems with the Project to RiverCity. In turn, RiverCity was required by contract to act as a conduit for passing these communications along to CDRC, who had hired RiverCity to be its "eyes and ears" with respect to the development of the Project. Pursuant to the Agreement, RiverCity was "to organize, coordinate, and provide advice with respect to design, construction and development of the Project." In particular, RiverCity's "Development Services" are detailed as follows:

> 2.2.7  Construction Meetings. Schedule and conduct meetings to discuss construction procedures, progress and scheduling with Contractor and the Project Architect. As deemed necessary, [RiverCity] shall prepare minutes of such meetings and promptly distribute such meeting minutes to [CDRC] and the meeting attendees or direct the Contractor or Project Manager Architect to prepare and distribute such minutes, as appropriate.

* * *

> 2.2.10  Punch List. Coordinate with the Project Architect in its review of the Project to enable the Project Architect to determine the date of substantial completion. At the substantial completion by the Contractor of the Project work, monitor the Project Architect in its inspection of the Project and preparation of a detailed "Punch List" specifying any items which require completion, installation or repair.

* * *

-14-

2.3    Reporting.    [RiverCity] shall furnish to [CDRC] monthly reports containing (i) a status of construction; (ii) a comparison of the Project Budget to construction costs incurred through the date of the report and a comparison of the Project Schedule to the work actually completed through the date of the report; (iii) a summary of change orders made during the month covered by the report; and (iv) any revision to the Project Schedule and/or  Project Cost Budget made during the month covered by the report.

Additionally, the contract entered into between Hargreaves and CDRC – AIA Document B141-1997 – states as follows in Section 1.2.2.3:

> ***[CDRC]'s Designated Representative identified in Paragraph 1.1.3 shall be authorized to act on [CDRC]'s behalf with respect to the Project.  [CDRC] or [CDRC]'s Designated Representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.***

(Emphasis added.).    Paragraph 1.1.3 lists RiverCity as the Owner's Designated Representative.

RiverCity clearly had a duty to report to CDRC and was authorized to act on CDRC's behalf.  Accordingly, Hargreaves and the other defendants/third-party defendants were entitled to rely upon RiverCity's knowledge and notice. *See* Am. Jur.2d *Agency* § 274 (2010).  All that RiverCity knew concerning the problems with the Project must be imputed to CDRC.

In the instant matter, the applicable statute of limitations is Tennessee Code Annotated section 28-3-105(1) (2000), pursuant to which actions for injuries to personal or real property shall be commenced within "three (3) years from the accruing of the cause of action."

Hargreaves asserts that between October of 2004 and no later than September 6, 2005, CDRC, through RiverCity, knew of the alleged property damage on the Project in light of the many reports distributed to RiverCity by Hargreaves.  RiverCity acknowledges that it "regularly kept CDRC and the City of Chattanooga and its representatives completely aware and updated regarding the status of construction and substantive changes."  Hargreaves argues that Chattanooga also knew of the problems through internal discussions with employees concerning the Project.  Despite having such knowledge, Chattanooga waited until 2008 to have an architect review the  issues, and then waited another year – March 19, 2009 – to file a complaint for damages.  Hargreaves argues that Chattanooga must be found

to have known of the problems before March 19, 2006 – three years prior to the filing of the complaint.

It is argued by Chattanooga that the cause of action did not accrue before March 19, 2006, because the information imparted by Hargreaves to RiverCity in late 2004 and throughout 2005, concerned only "minor corrective work." The Chattanooga entities rely on the affidavit of expert Vance Travis of TWH, who claims that "all items listed in the [Hargreaves] Affidavit . . . are 'punch list' items." According to Mr. Travis, "the 'punch list' becomes a part of the certificate of substantial completion[; i]n the construction industry a punch list is defined as the architect's list of work to be corrected or performed by the contractor prior to completion of the contract for construction." It is stressed by Chattanooga that Mr. McMillan of Hargreaves also categorized these problems as 'punch list' items. Therefore, according to Chattanooga, items described as "punch list" did not provide notice that the problems could not be corrected prior to the completion of the Project; such "punch list" items could not be considered significant enough to constitute breach of the construction contract and would not have started the clock running on the applicable statute of limitations.

Hargreaves responds that the easiest way to refute the contentions of Chattanooga is to compare the observations and recommendations provided by Mr. McMillan of Hargreaves in 2005 with the observations and recommendations provided by Mr. Travis in the 2008 TWH Report. The TWH Report, in its executive summary, provides as follows:

**Part One-Demolition, Reconstruction, Electrical and Plumbing**

Wall Repair – We recommend the East, West, and North walls to be demolished down to the 100 year flood line. Any existing open cavities between the remaining veneer and concrete retaining walls should be grouted solid. The block walls would be rebuilt with a full bed of mortar. Precast concrete coping units will replace existing cap blocks. Included will be the addition of through-wall flashing and weeps at the 100 year flood line sufficient to equalize pressure in a flood event greater than the 100 flood year elevation, and provide drainage at controlled locations to hopefully minimize the existing wall staining by efflorescence. The West stepped walls adjacent to the Aquarium would be repaired and receive precast concrete copings. Remediation work will occur at the bridge to separate the veneer from the bridge vibration and movement. Demolition and reconstruction will require the removal and re-installation of all art work cutouts and probably the round wall medallions on the West side.

Paving Repair – We recommend the complete removal of all paving units on the sand beds within the water feature. The extent would include the runnel adjacent to the Aquarium, all stepped landings leading down to and including the pool bottom. Demolition and reconstruction will require the removal and re-installation of the water spider at the pool bottom.

Electrical/Plumbing Repair – We recommend the complete removal of all niche light fixtures, housings, and junction boxes from the paving areas, along with the overhead fixtures below the bridge. All existing electrical panels would receive proper weatherproof housings, and the pump room equipment located in the vault at the upper end may need adjustments for proper clearances. New lighting would be provided and attached to a lighting truss located along the walkway adjacent to the Market Street Bridge. This truss would be the target of an arts grant for a cladding appropriate to the philosophy of The Passage.

In comparison, the observations and recommendations of Hargreaves to RiverCity provide as follows:

1) On October 28, 2004, Hargreaves reported to RiverCity that wall #1 is moving. It is also noted that the esplanade is settling on both sides of new parkway bridge and causing hairline cracks on wall #1 facing the river. Hargreaves recommended that Arcadis get involved to provide a repair strategy.

2) On January 7, 14, and 28, 2005, Hargreaves reported to RiverCity that the Passage wall number one was settling, control joints were in the wrong place, and the pavers needed to be fixed.

3) On January 25, 2005, Hargreaves reported to RiverCity the concern about water migrating into or being trapped behind wall cladding in the Passage.

4) On February 1, 2005, Continental reported to RiverCity that the concrete wall on the east side of the Passage was serpentine as it was out of plumb by three inches and out of alignment by six inches. Continental said that the masonry cladding would have to be changed from the design. (Hargreaves designed a straight, solid wall with no air gaps rather than a wall with veneer cladding affixed to a serpentine-like structure).

5) On February 25, 2005, Hargreaves reported to RiverCity that the Passage

wall was moving, the esplanade on both sides of the bridge was settling, and the pavers needed to be fixed. Hargreaves also noted a concern about the utility enclosures having to do with the electrical system.

6) On March 1, 2005, Hargreaves presented a detailed memo to RiverCity about the problems at the Passage and the possibility of demolition of one of the moving walls and the need for new construction.

7) On March 11, 2005, Hargreaves reported movement of Wall #2, a 3/4" drop on both sides of the new bridge, and a problem with the Package 2 pavers.

8) On March 18, 2005, Hargreaves reported to RiverCity again that the pavers needed to be fixed and that the Passage wall filling material was below the 100 year flood level.

9) On April 1, 2005, Hargreaves reported that the filling material was below the 100 year flood level, and it was a red level concern.

10) On April 8, 2005, Hargreaves reported to RiverCity its concerns about the Passage vault room vent power connection.

11) On April 29, 2005, Hargreaves reported to RiverCity its concerns about the mortar mix behind the veneer that attaches to the wall with specific reference to a possible big efflorescence problem. Hargreaves also noted the need to build a concrete wall because of weeping concerns. Hargreaves reported that expansion joints were missing in the wall. Hargreaves reported that the East Wall had moved another 1/4". Hargreaves reported concern about how some of the lighting in the Passage at the runnels had been done.

12) On May 3, 2005, Hargreaves reported that Wall #2 was moving and had cracked cladding on it and that it was the last chance to do whatever needed to be done before remedial action is necessary. Also reported that Wall #3 was settling with associated damage to cladding.

13) On June 10, 2005, Hargreaves reported to RiverCity that Wall #2 was moving again, that there was settling on both sides of the new bridge, that there was a problem with the mortar for the pavers, and that the expansion joints for the cladding were missing.

14) On September 6, 2005, Hargreaves reported to RiverCity problems

regarding the bump-out terrace differential settlement.

Obviously, the majority of the problems identified by Mr. McMillan of Hargreaves – the walls, the pavers, the mortar, the cladding, the expansion joints, the esplanade (sidewalks), wall filling below the 100 year flood level, problems with efflorescence – likewise are addressed in the TWH Report in a consistent fashion. The contentions of Chattanooga that the problems identified by Hargreaves in 2004 and 2005 were minor punch list items necessitating simple corrective measures must be disregarded. Descriptions of items involving terms such as "demolition" and "reconstruction" simply cannot be considered punch list items requiring "minor corrective work."

Hargreaves further notes that emails produced by Chattanooga during written discovery reveal that City employees were discussing the construction defects and property damage among themselves and with employees of RiverCity during May 2005. According to Hargreaves, these documents reveal an awareness of the damage and apparent construction defects more than three years before the lawsuit was filed. Specifically, on May 2, 2005, Lee Norris, Director, City Wide Services, Department of Public Works, City of Chattanooga, sent an email to Dan Kral of RiverCity asking:

Who is responsible for correcting construction defects?

That same day, he was informed that

CDRC has been the city[']s eyes and ears on all projects including infrastructure. They are responsible for the final walkthrough and getting punch list items corrected. Obviously, the contractor is responsible for fixing problems during the warranty period and after that it is US.

Later that same day, Mr. Norris replied,

If we don't have someone involved in the final checkout phase, I see long term issues. I walked the waterfront Sunday for a short while and easily identified 6-7 issues that will need to be corrected.

Mr. Kral further responded to Mr. Norris,

As I am sure you saw in my other email. Construction defects and/or damage as a result of construction is covered in all of our contracts.

Hargreaves further contends that the affidavits of Don Lewis, General Supervisor of the

River Front Park for the Parks and Recreation Department of the City of Chattanooga, and Bob Saylors, the Director of Parks for the Parks and Recreation Department of the City of Chattanooga, reveal that Chattanooga had notice of problems with the electrical circuits for the niche lights along the west wall of The Passage in 2005.

"Accrual" in a property damages action under Tennessee Code Annotated section 28-3-105(1) occurs upon discovery. *Damron v. Media Gen., Inc.*, 3 S.W.3d 510, 512 (Tenn. Ct. App. 1999). A statute of limitations will not be tolled in cases where the plaintiff has information that would place a reasonable person on inquiry notice that he may have a cause of action. *See Estate of Morris v. Morris*, 329 S.W.3d 779, 783 (Tenn. Ct. App. 2009). In *Northeast Knox. Util. Dist. v. Stanfort Constr. Co.*, 206 S.W.3d 454, 460-461 (Tenn. Ct. App. 2006), we held that "[a]ccrual did not require Stanfort to actually know the specific type of legal claim it had, and its lack of knowledge concerning the specific nature of the defendants' alleged tortious conduct is irrelevant for purposes of determining when the cause of action accrued."

Chattanooga had constructive and actual knowledge of the construction defects and damage regarding the Project. The evidence supports the determination of the trial court that Chattanooga had notice of a cognizable claim against another party at least three years prior to the filing of the complaint and failed to timely file this lawsuit within the statute of limitations period codified at Tennessee Code Annotated section 28-3-105. As the facts are not in dispute and clearly show that a cause of action has accrued and that the statute of limitations has run, summary judgment may be entered. *Osborne Enter., Inc. v. City of Chattanooga*, 561 S.W.2d 160, 165 (Tenn. Ct. App. 1977). The trial court did not abuse its discretion in refraining from granting additional time for discovery.[10] Hargreaves' motion for summary judgment was filed one year and eight months after the complaint was filed. As the statute of limitations defense was raised in Hargreaves's original answer, Chattanooga had been aware of the issue since June 1, 2009. Hargreaves had responded to the written discovery requests six months prior to the filing of the motion and 10 months prior to the hearing on the motion. Chattanooga had 10 months to review the documents. The date for the oral argument on the summary judgment motion was agreed upon 45 days prior to the hearing. Chattanooga had ample time to conduct discovery. Hargreaves and the other defendants and third-party defendants were entitled to judgment as a matter of law.

_____

[10]Counsel for Chattanooga did not request depositions of representatives of Hargreaves or RiverCity or anyone else. They did not file a motion for discovery or a motion to continue the hearing. Instead, they waited until the day of the agreed upon hearing date to argue the issue that consideration of the summary judgment motion was premature. As noted by defendants, waiting until the day of the hearing on a motion for summary judgment to seek additional time is usually too late. *See Harden v. Danek Medical, Inc.*, 985 S.W.2d 449, 453-54 (Tenn. Ct. App. 1998).

## V. CONCLUSION

The judgment of the trial court is affirmed and the cause remanded for collection of costs below. Costs on appeal are taxed to the appellants, the City of Chattanooga, Tennessee, and Chattanooga Downtown Redevelopment Corporation.

_____
JOHN W. McCLARTY, JUDGE